Matter of Triumpho v County of Schoharie (2021 NY Slip Op 06727)





Matter of Triumpho v County of Schoharie


2021 NY Slip Op 06727


Decided on December 2, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 2, 2021

531652
[*1]In the Matter of Antonia F. Triumpho, Respondent,
v
County of Schoharie et al., Appellants.

Calendar Date:October 15, 2021

Before:Egan Jr., J.P., Clark, Aarons, Pritzker and Reynolds Fitzgerald, JJ.

Roemer Wallens Gold & Mineaux LLP, Albany (Benjamin D. Heffley of counsel), for appellants.
Daren J. Rylewicz, Civil Service Employees Association, Inc., Albany (Jennifer C. Zegarelli of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the Supreme Court (Ferreira, J.), entered June 4, 2020 in Schoharie County, which granted petitioner's application, in a proceeding pursuant to CPLR article 78, to annul a determination of respondents terminating petitioner's employment.
Petitioner was employed, as a probationary employee, by respondent County of Schoharie Department of Public Works (hereinafter DPW) from May 2017 to April 2018. Despite receiving two interim probationary reports that indicated her performance was satisfactory during the course of her employment, on April 3, 2018, petitioner was called to a meeting with respondent Daniel Crandell, DPW's Commissioner, at which she was terminated after being told that she was "just not a good fit." Although petitioner received a written termination letter at the close of that meeting, petitioner received no prior warning or notice of any problematic conduct. Notably, petitioner was the only female employee of DPW that was in a position of manual labor at the time of her termination.
Thereafter, petitioner commenced this CPLR article 78 proceeding, alleging that respondents' decision to terminate her was based upon her gender, in violation of the Human Rights Law, and, thus, arbitrary and contrary to law; petitioner further alleged that respondents failed to comply with the terms of 4 NYCRR 4.5 (b) (5) (iii) by not providing her with notice prior to termination. Respondents answered, opposing the petition. Supreme Court found that petitioner's submissions were sufficient to raise an issue of fact as to whether she was terminated in bad faith and, accordingly, ordered a hearing pursuant to CPLR 7804 (h). After a two-day hearing, the court issued a thorough and well-reasoned decision finding that petitioner established, by a preponderance of the evidence, that she was terminated based upon her gender and that respondents did not substantially comply with the requisite notice requirements. The court therefore ordered that petitioner be restored to her position and compensated for back pay and lost benefits. Respondents appeal.
Respondents contend that Supreme Court erred in finding that petitioner was terminated on the basis of gender and granting the petition. "An employee's probationary appointment may be terminated without a hearing for any reason or no reason at all, so long as the termination was not in bad faith or for an improper or impermissible reason" (Matter of Messenger v State of New York Dept. of Corr. & Community Supervision, 151 AD3d 1433, 1433 [2017] [internal quotation marks and citations omitted]; see Matter of Swinton v Safir, 93 NY2d 758, 762-763 [1999]). "Judicial review of the discharge of a probationary employee is limited to whether the determination was made in bad faith or for an improper or impermissible reason" (Matter of Petkewicz v Allers, 137 AD3d 1045, 1046 [2016] [citations omitted]; see Matter of Johnson v City of New York, 34 AD3d 484, 485 [2006]).
In support [*2]of her application, petitioner submitted the two interim probationary reports, dated July 10, 2017 and November 13, 2017, that had been completed during her employment. Both of these reports indicate that petitioner performed satisfactory work and was recommended to be retained in her probationary status. Petitioner also furnished the termination letter that she had been given on April 3, 2018, which informed her that respondents "ha[d] decided to terminate [petitioner's] service with [DPW] effective Friday April 6, 2018, prior to the end of [petitioner's] [one]-year probationary period." At the CPLR 7804 (h) hearing, petitioner testified that, aside from clerical and cleaning staff, DPW had approximately 70 employees and that she was the only female. Petitioner explained that her position included, among other duties, flagging, manual labor, shoveling and detailing vehicles. Petitioner testified that, on her assignments, there was not always a bathroom readily available and there were no portable toilets at work sites, so someone would take her in one of respondents' trucks to find one; eventually, she was permitted to go alone. Petitioner averred that there were occasions where there was no bathroom nearby and that she would have to "find an area on the side of a back road or in the woods." Petitioner explained, in detail, one occasion in February 2018 and another in March 2018 when she was on her menstrual cycle and needed to use a restroom and that Michael Stone, the foreperson, was dismissive of her request. During the incident in March 2018, after ignoring her request, Stone walked away, only to go over to her male counterparts and make a comment to which they started laughing while looking directly at her. After this March 2018 incident, petitioner worked in the shop the rest of the week while on her menstrual cycle.
Petitioner recalled that, during her July 2017 sit-down evaluation, she asked Patrick Slater, her supervisor, if there was anything she could do to improve, and Slater did not indicate any problems with her performance, attitude or attendance. Petitioner asserted she received substantially the same feedback at a later evaluation in November 2017, except that, this time, she had disclosed to Slater that she did not like the way that Stone had been treating her and that it appeared to her that she was being treated differently than her male counterparts. Petitioner testified that Slater told her that that was how "Stoney" was and to brush it off. Petitioner testified that, when she was informed at the April 3, 2018 meeting that she was being terminated, the reason Crandell gave her was, "It's just not a good fit." Petitioner asserted that she was very shocked and did not see the termination coming, such that she asked for an explanation three times; again, petitioner was told that "some people fit in here and some people don't, and you just don't fit in." Petitioner confirmed that she received no notice of her termination [*3]prior to the meeting on April 3, 2018. When asked why petitioner did not file a complaint for sexual harassment,[FN1] which she testified was ongoing, petitioner averred that she was just trying to fit in and was concerned that her complaint would not be taken seriously. According to petitioner, she was getting to a point where she felt she had to report the harassment; she had made a comment to "some of the other guys" to that effect and that she was fired less than a week later.
Additionally, petitioner proffered an affidavit from a coworker who had worked alongside her on various occasions. The coworker averred that he "never witnessed [p]etitioner refuse an assignment or not complete an assignment satisfactorily," and he described petitioner as "extremely reliable and genuinely interested in learning about various tasks and operating equipment." The coworker also averred that he had been "surprised to learn of [petitioner's] termination" in light of her "strong work ethic and willingness to perform any task." Another coworker, who worked with petitioner approximately once per week, testified similarly to his surprise over petitioner's termination due to her strong work ethic. He also testified that, at one point, petitioner questioned why she was assigned to "flagging" so often, but she did not refuse any assignment. When asked if petitioner complained about flagging more than her male counterparts, the coworker replied in the negative, asserting that "[n]obody likes to flag." A DPW supervisor, who had observed petitioner working on approximately 10 occasions, averred that petitioner had a good work ethic based upon the fact that "whenever [he] witnessed her, she was working just like everyone else, if not more so." The supervisor testified that he was surprised by petitioner's termination because he had never heard her complain about or refuse assignments.
Respondents also called a number of witnesses, including Crandell, who testified that he was responsible for all hiring and firing decisions at DPW. He explained that the termination process typically involves receipt of the employee's quarterly probationary reports and discussions with that employee's immediate supervisor who, for petitioner, was formerly Slater, followed by Mark Skinner. According to Crandell, comments that petitioner "wasn't following directions" and was "complaining" started "three to four months into her employment"; such comments came from Stone, Slater and Skinner. Crandell ultimately made the decision to terminate petitioner based upon reports from supervisors that "she was argumentative and very often didn't want to do certain things." Crandell recalled having told petitioner that she was being terminated because she was "not a good fit," but he denied that the decision had anything to do with petitioner's gender. Crandell also testified that petitioner's termination did not have anything to do with her bathroom usage. Crandell acknowledged that the [*4]applicable civil service rules provide that petitioner was to be advised of her status and progress and that he had not done so; Crandell stated that he "would assume" that supervisors would have done so. Crandell confirmed that petitioner did not receive any written notice prior to her termination. Slater testified that, although Stone had come to him with complaints regarding petitioner, Slater marked her performance as satisfactory for both her July 2017 and November 2017 reviews because "[s]he was borderline at that time." According to Slater, he had first begun hearing complaints about petitioner six months into her employment but did not so indicate on her interim reports. Slater confirmed that he met with petitioner regarding each interim report and that they did not discuss her complaints about flagging; Slater also confirmed that petitioner had brought up concerns that she had with Stone at one of her evaluations.
Stone also testified, explaining that he supervised petitioner approximately 40% of the time. Stone recalled that petitioner "did really well" at first but had "started getting a little laxed [sic] on what she wanted to do, when she wanted to do it." Stone testified that "[n]obody likes to flag" and replied in the negative when asked if her complaints differed from other members of the crew. Stone stated that he did not have any issues with petitioner's performance and that she generally met his expectations, but that his issue with petitioner was her "attitude." When asked to elaborate, Stone stated that his issue was "[j]ust the nagging and wanting to not flag . . . and [petitioner] act[ing] like [he] was treating her different because of being a woman [rather] than a man." Stone averred that petitioner's complaints were more intense than her male counterparts, specifically averring, "Because a guy, I guess, would just shut up and do it, where [petitioner] would just keep nagging." Stone denied having made jokes about petitioner's gender or being a woman to DPW employees; however, on cross-examination, Stone acknowledged that he did make jokes about petitioner to other DPW employees. Stone also confirmed that he had spoken to Crandell about petitioner's bathroom usage, which he averred was two or three times a day, and had stated that "it was beginning to be a bad habit." Skinner testified that he had supervised petitioner approximately for three weeks out of the total time of her employment and that petitioner complained about flagging "[o]n a couple of occasions" but that it was "[n]ot everyday." Skinner conceded that petitioner did not complain about flagging any more than her male counterparts, but that her complaints were "a lot more intensified." Other witnesses corroborated that petitioner had complained about flagging, but ultimately conceding that it was not more than other employees.
Given the foregoing, petitioner met her burden of establishing that her termination from probationary employment was [*5]for an impermissible reason by proffering her satisfactory probationary reports and testimony by coworkers and supervisors as to her work ethic and job performance, as well as testimony establishing that her conduct did not substantially differ from that of her male counterparts (see Matter of Capece v Schultz, 117 AD3d 1045, 1046 [2014]; cf. Miranda v ESA Hudson Val., Inc., 124 AD3d 1158, 1161 [2015]). Accordingly, "[t]he burden of persuasion . . . shifted to [respondents] to establish that [their] actions were motivated by a legitimate business reason" (Matter of Johnson v City of New York, 34 AD3d at 485; see Matter of Capece v Schultz, 117 AD3d at 1046).
To that end, Supreme Court found that, "[i]n the absence of any credible evidence that her work performance provided a basis for her termination, [it was] compelled to find that the only reason she was terminated was because of her gender." Significantly, the court found respondents' assertions regarding "[p]etitioner's alleged argumentative attitude" to "reflect more of a post-termination justification for her dismissal than a valid or proper basis for the termination of her employment." Although respondents assert that petitioner's termination was due to her attitude toward flagging duty, this allegation is belied by testimony from most, if not all, of the witnesses that nearly all DPW employees dislike flagging and make complaints similar to that of petitioner. Similarly, the credibility of such assertions are undermined by testimony that petitioner's job performance was satisfactory and that she was never spoken to regarding such purported conduct (see Matter of Board of Educ. of Deer Park Union Free School Dist. v New York State Pub. Empl. Relations Bd., 167 AD2d 398, 400 [1990], lv denied 77 NY2d 805 [1991]; compare Matter of Suleman v State of N.Y. Dept. of Taxation & Fin., 27 AD3d 1040, 1042 [2006]). Thus, respondents failed to meet their burden of establishing a legitimate, nondiscriminatory purpose for petitioner's termination (see Matter of Capece v Schultz, 117 AD3d at 1046; Matter of Johnson v City of New York, 34 AD3d at 485; compare Matter of Solomon v New York State Off. of Children & Family Servs., 170 AD3d 1297, 1298 [2019], lv denied 33 NY3d 908 [2019]). Thus, Supreme Court properly annulled the determination and reinstated petitioner to her probationary position of laborer and determined that she was entitled to receipt of full back pay (see Matter of Capece v Schultz, 117 AD3d at 1046; Matter of Johnson v City of New York, 34 AD3d at 486). Finally, we are unpersuaded by respondents' remaining contention that Crandell complied with civil service rules when terminating petitioner as it is undisputed that petitioner did not receive written notice at least one week prior to her termination (see 4 NYCRR 4.5 [b] [5] [iii]; Matter of Santucci v City of Mount Vernon, 165 AD3d 803, 804 [2018]).
Egan Jr., J.P., Clark, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED [*6]that the judgment is affirmed, without costs.



Footnotes

Footnote 1: Petitioner testified regarding multiple instances of alleged sexual harassment, both by coworkers and Stone, but primarily by Stone. This included one incident when Stone approached her with a stop/slow paddle for directing traffic and asked petitioner "if [she'd] like to be spanked"; petitioner stated that she responded by telling Stone firmly to "stay away."